IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| DORRIE HAAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-0006-CV-W-RED |
| | ) | |
| JOSEPH HAAKE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

The Court held a bench trial in this case on Monday, April 14, 2008. After considering the evidence and arguments submitted by the parties, the Court hereby makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### *The Parties*

1. Plaintiff Dorrie Haake and Defendant Joseph M. Haake, Jr. are brother and sister. Debbie Haake is their sister. Their father, Joseph M. Haake, Sr., is deceased.

2. Plaintiff did not attend college. She worked as a press operator until she lost her job. She had been a press operator for about 37 years. She spent approximately two years unemployed, and she recently obtained part-time employment with a deli in a grocery store. Plaintiff has no accounting, bookkeeping, or business experience, and she did not attend college. She has never done her own tax returns. Before this lawsuit, Plaintiff did not know how to determine the value of a corporation's stock. In fact, she has never owned stock in a publicly traded company and has never operated a business of any kind. Plaintiff lives in a house she received from her father's estate when

he died.  She has never purchased real estate, and prior to this lawsuit, she had limited knowledge of the values of real property.  The largest purchase Plaintiff ever made was the purchase of a car.

3. Defendant owns and operates Die Makers Supply Company ("Die Makers").  Die Makers is a business that Joseph Haake, Sr. founded, and Defendant has been involved in the corporate operations and affairs of Die Makers throughout his life.  Defendant demonstrated a general understanding of a stock's par value and general corporate operations and procedures at the hearing.  His testimony established that he is an educated businessman with a clear understanding of business and property matters.

### *Arrowcrest*

4. Joseph Haake, Sr. established a company called Arrowcrest-R., Inc. ("Arrowcrest") while he was alive.

5. Arrowcrest owns two parcels of real property.  Arrowcrest owns real property in Kansas City, Missouri and in Morgan County, Missouri.  Arrowcrest owned these properties at all times relevant to this case.

6. The property in Kansas City includes a warehouse and office space located in an industrial area.  Arrowcrest leases the Kansas City property to Die Makers, Defendant's company, for $350 per month.  The rent has not been increased for the past ten years.  At times Die Makers fell behind on the rent, but Arrowcrest did not charge it interest or late fees.  Arrowcrest did not terminate the lease despite Die Makers' failure to timely pay rent.

7. The property in Morgan County is an approximately 700 acre farm or ranch that is used for recreation and tree harvesting.  Defendant argued at the hearing that the fair market value of the property is $51,000, but he testified that he "wouldn't sell it for that."  He also testified that

there is a small cabin on the property that, separate from the land, is insured for $45,000. The credible evidence at the hearing established that the fair market value of the property, including the land and the cabin, is at least $500,000.

8. In 2001, Arrowcrest's modest revenue came from the lease of the Kansas City property and from the sale of trees from the Morgan County property. Arrowcrest did not have any liabilities in 2001, and its 2001 expenses were approximately $8,000. Arrowcrest's 2001 financial documents also show a $16,900 loan. Arrowcrest made the loan to Die Makers at 6 % interest. The corporation generally operated at a net loss.

9. Prior to September 25, 2001, there were four shareholders of Arrowcrest. Plaintiff and Defendant were two of the shareholders. The remaining shares were held by Debbie Haake and Vernon Shultz, a friend of Joseph Haake, Sr.

10. Plaintiff owned 355 shares of Arrowcrest. She owned between 20 % and 30 % of the company's stock.

11. Defendant owned more shares in Arrowcrest than any other shareholder. There is some evidence that he owned a majority of the shares, but there is other evidence that he owned a mere plurality of the shares. The Court need not resolve this factual discrepancy to determine the issues presented in this case.

12. A variety of officers and directors held positions with Arrowcrest since its creation. Defendant has been the president of Arrowcrest since 1998, and Die Makers and Arrowcrest share a corporate office. At all times relevant to this lawsuit, Defendant governed the operations of Arrowcrest. The corporation was generally under his control, and it did what he decided it should do.

13. Plaintiff was never an officer or director of Arrowcrest, and she was not involved in the operations of the company. She had little, if any, information about Arrowcrest's operations or finances. Prior to this lawsuit, Plaintiff thought Arrowcrest owned Die Makers and she did not know how many shares of Arrowcrest she or anyone else owned.

*First Stock Transaction*

14. In 2001, Plaintiff contacted Defendant and informed him that she needed money to repair her home. Plaintiff asked for a loan, but Defendant refused to loan her money. Instead, they discussed a potential sale of Plaintiff's shares.

15. Plaintiff asked Defendant about the value of her shares in Arrowcrest. As Plaintiff's brother and as an officer and director of Arrowcrest, Defendant informed her that the value of her shares fluctuated between $22 and $29 per share. The fair market value of Plaintiff's shares was much higher because Arrowcrest owned more than $500,000 in assets, and its liabilities and expenses were negligible. Despite Defendant's testimony to the contrary, the Court finds that Defendant knew that he misrepresented the value of Plaintiff's shares. The Court also finds that Plaintiff did not know that Defendant misrepresented the value of her shares.

16. On September 25, 2001, Plaintiff relied on Defendant's statement about the value of her shares, and she sold 18 of her shares to Arrowcrest for $25 per share pursuant to a verbal agreement with Defendant.

17. Plaintiff believed that she was selling her shares to Defendant, not to Arrowcrest. The $450 used to purchase the shares, however, came from Arrowcrest's funds.

4

*Correspondence Between First and Second Transaction*

18. Plaintiff believed that she and Defendant had reached an oral agreement in September 2001 under which Defendant would incrementally purchase all of her shares in Arrowcrest with periodic payments.

19. Plaintiff did not promptly receive another payment for her shares, and she still needed funds to pay for home repairs. In 2002, Plaintiff asked Defendant about the status of their arrangement and about Arrowcrest's structure, operations, and finances.

20. During their conversations, Defendant told Plaintiff that she could sell her shares to anyone who wanted to purchase them. After Plaintiff found potential purchasers for her shares, however, Defendant told Plaintiff that any purchaser would not be allowed to hunt on or use the property in Morgan County. When Plaintiff told the potential purchasers that they would not be allowed to use the Morgan County property, they were no longer interested in buying the shares. Despite Arrowcrest being a very closely held small corporation, Defendant's explanation to Plaintiff was that the stock was just like Sears stock, and even though you owned it you still could not go in the store and use the appliances.

21. On December 3, 2002, Plaintiff sent a letter to Defendant requesting information about Arrowcrest.

22. On December 31, 2002, Defendant mailed a response to Plaintiff with brief financial documents enclosed. The documents did not contain information by which Plaintiff could have determined the value of the corporation or its assets.

23. Between January 1, 2003, and October 20, 2003, the parties discussed a potential sale of Plaintiff's shares to Defendant. At no point during these discussions did Defendant give Plaintiff information from which she could determine either the value of her shares or the value of Arrowcrest's assets as compared to its liabilities and expenses. At no point during these discussions did Defendant inform Plaintiff that his prior statement that the shares were worth between $22 and $29 per share was incorrect.

*Second and Final Stock Transaction*

24. In October 2003, Defendant contacted Plaintiff and told her he wanted to buy her remaining shares. Plaintiff asked Defendant if she could think about it for a while, but Defendant insisted that he needed an immediate answer. She agreed to sell him the shares.

25. On October 20, 2003, Defendant came to Plaintiff's home to agree on a price and complete the transaction. Plaintiff relied on Defendant's previous representation about the value of her shares, and she agreed to accept $7500 as payment for her remaining 337 shares. Defendant wrote Plaintiff a check for $7500 from his personal funds.

26. Plaintiff was not granted an option to repurchase her shares despite the fact that Defendant sold 100 shares to Arrowcrest and received a free option to repurchase the shares for the same price that Arrowcrest paid him.

27. The only information Plaintiff received about the value of her shares was Defendant's statement that the value of her shares fluctuated between $22 and $29 per share. Defendant knew that this information was false, but he did not tell Plaintiff that it was false and he did not provide Plaintiff with information she could use to determine that it was false. Plaintiff did not know the

6

information was false, and she reasonably relied on it to her detriment by selling 18 shares to Arrowcrest and 337 shares to Defendant at an extremely low price.

28. It "never crossed [Defendant's] mind" that he had an obligation as Plaintiff's brother and as an officer and director of Arrowcrest to talk with Plaintiff about how she should evaluate the company and the value of her shares.

## CONCLUSIONS OF LAW

### *Breach of Fiduciary Duty*

To prevail on her breach of fiduciary duty claim, Plaintiff has the burden of proving that (1) Defendant owed her a fiduciary duty, (2) Defendant breached the duty, and (3) the breach caused harm to Plaintiff. *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 381 (Mo. App. 2000).

"It is well-established that corporate officers and directors occupy a fiduciary relation to the corporation and to the stockholders." *Id.* at 382. In addition, although a fiduciary relationship is not proven merely by showing that persons have family ties, such ties are a factor to be considered in determining whether a fiduciary relationship exists. *Williams v. Walls*, 964 S.W.2d 839, 846 (Mo. Ct. App. 1998). As an officer and director of Arrowcrest, Defendant owed a fiduciary duty to Plaintiff, a shareholder. The fact that Defendant is Plaintiff's brother is further evidence of Defendant's duty to Plaintiff.

Defendant owed Plaintiff a duty to "act with fidelity and subordinate [his] personal interest to the interest of the corporation" and the shareholders. *Zakibe*, 28 S.W.3d at 382 (internal quotation omitted). Defendant breached this duty by failing to disclose the non-public information that he had regarding Arrowcrest's assets and liabilities and the value of Plaintiff's shares. Moreover,

7

Defendant breached his duty to Plaintiff by deliberately misrepresenting the value of Plaintiff's shares in efforts to obtain Plaintiff's shares at an extremely low price.

Defendant has continually manipulated Plaintiff with regard to her Arrowcrest shares. Defendant sabotaged the sale of Plaintiff's shares to other interested parties by stating that he would not let them hunt the Morgan County property. When Plaintiff told Defendant that she needed money, Defendant refused to permit Arrowcrest to loan money to Plaintiff even though Arrowcrest loaned Die Makers money at a generous interest rate. When Plaintiff asked Defendant about Arrowcrest's financial status, he sent her documents that could not be used to determine the value of her shares. Throughout the relevant time period, Defendant took advantage of Plaintiff's lack of knowledge and her imminent need for money. Defendant breached his fiduciary duty to Plaintiff.

Defendant's conduct harmed Plaintiff because she reasonably relied upon Defendant's misrepresentation and sold her shares to Arrowcrest and Defendant for significantly less money than her shares were worth. Plaintiff met her burden to prove that Defendant breached a fiduciary duty he owed her.

### *Fraud*

To prevail on her fraud claim, Plaintiff has the burden of establishing the following: (1) a representation by Defendant, (2) its falsity, (3) its materiality, (4) Defendant's knowledge of its falsity or his ignorance of the truth, (5) Defendant's intent that it should be acted upon by Plaintiff in a manner reasonably contemplated, (6) Plaintiff's ignorance of the falsity of the representation, (7) reliance by Plaintiff on the truth of the representation, (8) Plaintiff's right to rely thereupon, and (9) injury to Plaintiff consequently and proximately caused by the representation. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. 1988).

Defendant represented to Plaintiff that her Arrowcrest shares were worth between $22 and $29 per share. Because Arrowcrest had more than $500,000 in assets and had negligible liabilities and expenses, Plaintiff's 355 shares were worth much more than Defendant represented. Accordingly, Defendant's representation was false. It was also material because the misrepresentation about price was made during conversations about Plaintiff's potential sale of her shares to Defendant.

Despite Defendant's testimony to the contrary, the Court finds that Defendant knew his statement was false. He was intimately involved in the affairs of Arrowcrest. He knew the company's financial state, and he possessed sufficient information to determine the value of Arrowcrest's shares. As a sophisticated and educated businessman, Defendant knew that Arrowcrest's assets were worth much more than he represented to Plaintiff.

Defendant also intended Plaintiff to act upon the misrepresentation. He made the misrepresentation in efforts to obtain Plaintiff's Arrowcrest shares at an extremely low price for his own benefit. Defendant had ample opportunity to later tell Plaintiff that his statement was incorrect, or at least to give Plaintiff sufficient information about the company so she could independently determine the value of her shares, but he did not do so.

Plaintiff did not know that Defendant's statement about the value of her shares was false. Plaintiff is relatively unsophisticated. She has little if any business training and experience. Before this case, she did not have prior experiences with real estate that would have allowed her to determine the value of Arrowcrest's assets or her shares. She did not have the information, skills, or training necessary to determine that her shares were worth more than Defendant represented.

Plaintiff credibly testified that she relied upon Defendant's representation about the value of her Arrowcrest shares when she sold her shares. Her testimony is supported by the fact that she sold her shares for an amount between $22 and $29 per share. Plaintiff had a right to rely on Defendant's statement because he was her brother and an Arrowcrest officer and director. Defendant had all of the information about Arrowcrest's assets, liabilities, expenses, and affairs in general. Plaintiff did not have this information. Despite Defendant's uncooperative conduct, Plaintiff reasonably believed that Defendant would not lie to her about the value of her shares, and Defendant was obligated to tell her the truth.

Defendant's misrepresentation consequently and proximately caused injury to Plaintiff because she sold her shares to Arrowcrest and Defendant for an extremely low price that was within the $22 to $29 range Defendant incorrectly told Plaintiff her shares were worth. Plaintiff met her burden to prove that Defendant defrauded her.

### *Statutory Securities Violations*

It is uncontested that Plaintiff's Arrowcrest shares were subject to Missouri's securities laws. Missouri's securities laws state:

> A person is liable to the seller if the person buys a security by means of an untrue statement of a material fact or omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, the seller not knowing of the untruth or omission, and the purchaser not sustaining the burden of proof that the purchaser did not know, and in the exercise of reasonable care, could not have known of the untruth or omission.

Mo. Rev. Stat. § 409.5-509(c) (2007).

Plaintiff's Arrowcrest shares were worth much more than $22 to $29 per share, and Defendant's statement to the contrary was untrue. Plaintiff testified that she did not know that her shares were worth more than Defendant told her, and she relied upon his statement when she sold

10

her shares. Plaintiff's testimony in this regard was credible because of her lack of experience and education in business and real estate. Plaintiff did not know the value of her shares, and she reasonably relied on Defendant's statement about the value of her shares.

Defendant testified that he legitimately thought the value of Plaintiff's shares was between $22 and $29 per share. His testimony is not credible, however, because of his high level of training, sophistication, and business experience. Defendant had an expansive understanding of Arrowcrest's finances and affairs. He may not have known the exact value of Plaintiff's shares, but he knew they were worth much more than $22 to $29 per share. Accordingly, Defendant did not sustain his burden to prove that he did not know and could not have known that his statement to Plaintiff was false.

Plaintiff is entitled to recover under Mo. Rev. Stat. § 409.5-509(c) (2007).

### *Appropriate Remedy*

Plaintiff has requested that the Court rescind the sales of her shares and award her attorneys' fees. Plaintiff tendered the money that she received for her stock, and she is ready, willing, and able to rescind the transactions. Because Plaintiff has established fraud in the inducement, rescission is an appropriate remedy. *Cabinet Distributors, Inc. v. Redmond*, 965 S.W.2d 309, 314 (Mo. App. 1998).[1] Moreover, Plaintiff is entitled to rescind the sales and recover her shares under Mo. Rev. Stat. § 409.5-509(c)(1). Plaintiff is also entitled to recover attorneys' fees under the statute.

### *Plaintiff's Motion for Temporary Restraining Order*

---

[1] The Court notes that there is authority permitting rescission even if the misrepresentation is innocent or negligent. *Cabinet Distributors, Inc.*, 965 S.W.2d at 314.

11

On April 18, 2008, Plaintiff filed a Motion for Temporary Restraining Order (#53).  The motion requests that the Court enter an order prohibiting Defendant from exercising his purported option to repurchase the 100 shares that he previously sold to Arrowcrest.  Defendant's option to repurchase shares from Arrowcrest arose as a matter collateral to the relief requested in this lawsuit.  Plaintiff filed this case to obtain relief for Defendant's purchase of her shares, not to enjoin Defendant from repurchasing shares he sold to the corporation.  If plaintiff, Debbie Haake, or Arrowcrest want a Court order regarding Defendant's option to repurchase shares, they need to file a new lawsuit requesting such an order.  Filing a post-trial motion in this case is not the appropriate method for obtaining such relief.

## CONCLUSION

The long and short of the evidence in this case is that Arrowcrest is a very closely held corporation that has been totally dominated by Defendant.  Plaintiff and her sister have essentially been shut out from receiving the benefits of their stock ownership.  Defendant has manipulated the corporation to serve his and his family's needs as reflected by the several "sweet" deals he has made to benefit his personal interests.  Defendant's role in the operation of Arrowcrest, in addition to the legal analysis set forth above, doesn't come close to passing any type of "smell test" of fairness that would be expected of a person in Defendant's position.

After careful consideration, the Court **DENIES** Plaintiff's Motion for Temporary Restraining Order (#53).  The Court also enters judgment in favor of Plaintiff and against Defendant on all three counts in Plaintiff's Petition.  The Court hereby rescinds and cancels the September 25, 2001 and October 20, 2003 sales of Plaintiff's 355 shares to Arrowcrest and Defendant.  Plaintiff shall file her

12

motion requesting a specific amount of attorneys' fees with supporting documentation on or before May 23, 2008.

      **IT IS SO ORDERED.**

DATED:     May 13, 2008                       */s/ Richard E. Dorr*
                                                     RICHARD E. DORR, JUDGE
                                                     UNITED STATES DISTRICT COURT